UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KELLY CRINE, ASHLEY CROCKWELL, CHRISTINA DALEY, PHYLLIS DESAUTELS, JULIE ROWAN, COLLEEN HENRY, BRIANNE BRUSO, JENNIFER HEATH-THOMAS, and CHRISTINE QUILLEN,

Plaintiffs,

v.

BERKSHIRE HEALTH SYSTEMS, INC., BERKSHIRE MEDICAL CENTER, INC., BERKSHIRE FACULTY SERVICES, INC., FAIRVIEW HOSPITAL, INC., and HOSPICE OF FRANKLIN COUNTY, INC.,

Defendants.

*Case No. 3:22-cv-30143-MGM*
*(Consolidated Case Number)*

**LEAVE TO FILE EXCESS PAGES GRANTED ON AUGUST 21, 2025**

CHRISTINE RYAN, BECKY ZEPKA, KRISTY GUERINO, JENNIFER LUZIS, and MEAGEN SHEARS,

Plaintiffs,

v.

BERKSHIRE HEALTH SYSTEMS, INC. and BERKSHIRE MEDICAL CENTER, INC.,

Defendants.

**BERKSHIRE HEALTH SYSTEMS, INC., BERKSHIRE MEDICAL CENTER, INC., BERKSHIRE FACULTY SERVICES, INC., AND FAIRVIEW HOSPITAL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

In this employment discrimination case, Plaintiffs assert that in late 2021 – during the unprecedented COVID-19 public health emergency that challenged the operational capacities of healthcare organizations across the country – Berkshire Health Systems, Inc. ("BHS") and its controlled affiliates, Berkshire Medical Center, Inc. ("BMC"), Fairview Hospital ("Fairview"), and Berkshire Faculty Services, Inc. ("BFS", and collectively with BMC, Fairview and BHS, the "Defendants" or "BHS") were required under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), to permit employees who declined to take the COVID-19 vaccine for religious or medical reasons to provide direct care to patients, accepting the heightened risk these unvaccinated employees would contract and transmit the potentially deadly and highly-transmissible COVID-19 Delta variant to patients, visitors and co-workers.[1] Neither Title VII nor the ADA impose any such requirement where, as the undisputed facts demonstrate here, BHS reasonably determined that the requested accommodations would have created substantial health and safety risks, potentially exacerbated a severe staffing shortage, jeopardized BHS's ability to provide critical services, and undermined the public's trust in BHS and the safety of its facilities. Accordingly, Defendants move pursuant to Fed. R. Civ. P. 56 for summary judgment in their favor dismissing all claims on the grounds that, even assuming each of the Plaintiffs had a legitimate religious or medical basis for declining the vaccine, the undisputed evidence establishes that, based on objective,

[1] Plaintiffs Kelly Crine, Ashley Crockwell, Christina Daley, Phyllis Desautels, Julie Rowan, Colleen Henry, Jennifer Heath-Thomas, Christine Ryan, Becky Zepka, Kristy Guerino, Jennifer Luzis and Meagen Shears sought exemptions to BHS's vaccination requirement for alleged religious reasons, and bring their failure to accommodate claims under Title VII. First Amended Complaint Case 3:22-cv-30143 (ECF No. 13) Counts 1-12, 15-16; First Amended Complaint, Case 3:23-cv-30015 (ECF No. 4) Counts 1-10. Plaintiff Christine Quillen sought an exemption to the requirement for a medical reason, and brings her failure to accommodate claim under the ADA. First Amended Complaint, Case 3:22-cv-30143 (ECF No. 13) Counts 17-18.

scientific evidence and the judgment of their clinical leadership, BHS reasonably determined that providing the requested accommodations would have resulted in substantial health and safety risks as well as other substantial costs, and therefore would have constituted an undue hardship and direct threat as a matter of law under controlling precedent.

## SUMMARY OF UNDISPUTED FACTS

### The BHS Defendants and their Charitable Mission

BHS is a private, not-for-profit charitable health organization providing comprehensive healthcare services through its controlled affiliates in Berkshire County, Massachusetts. Statement of Undisputed Material Facts ("SUF") ¶ 1. BMC, BFS, and Fairview, all controlled affiliates of BHS, are, like BHS, not-for-profit charitable organizations. Id.

The charitable mission of BHS is to improve the health of all people in the Berkshires and surrounding communities, regardless of their ability to pay. SUF ¶ 2. BHS is dedicated to ensuring safe patient care and providing its caregivers with the safest possible environment in which to conduct their lifesaving work. SUF ¶ 3.

BHS operates in a rural community, the second most rural county in the Commonwealth. SUF ¶ 4. BHS treats some of the most medically complicated and vulnerable patients in Berkshire County. SUF ¶ 5. The Berkshire County population in the aggregate have higher health risks than populations in other parts of the Commonwealth. SUF ¶ 6. In 2021, it was reported that over 20% of the population in Berkshire County was over the age of 65, which made that population highly susceptible to a variety of health issues. SUF ¶ 7. Berkshire County also had higher rates of smoking, obesity and excessive drinking than in other areas of the Commonwealth, which contributed to higher rates of chronic disease. Id.

In 2021, BHS operated the only two hospitals in Berkshire County: BMC, a community hospital in Pittsfield, MA with 298 beds, and Fairview a community hospital in Great Barrington with 25 beds. SUF ¶ 8. BHS operated in 30 separate locations across Berkshire County and, on August 6, 2021, employed, through its controlled affiliates, approximately 4,139 employees. SUF ¶ 13. BHS provided 24-hour emergency care at BMC and Fairview, and at a Satellite Emergency Facility on a BMC campus in North Adams. SUF ¶ 10. BHS also provided patient services through its clinics, including the rural health clinic of Fairview known as Williamstown Medical, and through its affiliated physician practice groups operated by BFS. SUF ¶ 11. BHS also operated an Urgent Care facility in Pittsfield, Massachusetts and provided in-home care to residents of Berkshire County through its visiting nurse association, BVNA, a part of BMC. SUF ¶ 12.

BHS's Chief Medical Officer and Chief Quality Officer throughout the COVID-19 pandemic was (and remains) James Weil Lederer, Jr., M.D., a physician board-certified in infectious disease and internal medicine with extensive experience in infection control and quality, and two decades of experience in senior clinical leadership positions. SUF ¶¶ 14–17. BHS's senior human resources officer during this period was Patrick Borek. SUF ¶ 18. The most senior nursing officer at BMC during this period was Brenda Cadorette, MSN RN, NEA-BC. SUF ¶ 19.

**The Plaintiffs**

Each of the Plaintiffs provided direct care to patients, and each cared for multiple patients during every shift. SUF ¶ 117. None of the Plaintiffs could perform the essential functions of their jobs remotely. SUF ¶¶ 116, 120(a)-(m).

Plaintiffs Daley, Desautels, Luzis and Zepka worked as registered nurses at BMC, providing direct patient care, with multiple encounters with patients and staff during every shift. SUF ¶¶ 120(c); 120(d); 120(h); 120(m). Plaintiff Rowan worked as a registered nurse practitioner in BMC's Department of Surgery, assisting surgeons in operating rooms and managing patients on the surgical nursing unit. SUF ¶ 120(j).

Plaintiff Crockwell, also a registered nurse, worked with patients directly in their homes, typically with family members present. SUF ¶ 120(b). Plaintiff Guerino, a physical therapist assistant, also worked directly with patients in their homes, providing physical therapy interventions. SUF ¶ 120(e).

Plaintiff Crine worked as an occupational therapist at BMC, working directly with hospital patients in their hospital rooms. SUF ¶ 120(a). Jennifer Heath-Thomas worked as an Emergency Department technician in Fairview's Emergency Department. SUF ¶ 120(f). Christine Ryan worked as an X-Ray Technology Specialist (CT), also working with multiple patients and staff every shift. SUF ¶ 120(k). Meagen Shears worked as a Medical Assistant II in the Colorectal Surgery Department at BMC, working directly with patients. SUF ¶ 120(l). Christine Quillen worked at BMC as a technologist in the Radiology Department, and also worked with multiple patients every shift. SUF ¶ 120(i).

Colleen Henry was employed as a physician assistant at Williamstown Medical, providing primary care to patients, including conducting physical examinations. As a physician assistant, she was required to be and was supervised by a physician. SUF ¶ 120(g).

**The COVID-19 Pandemic**

COVID-19 is an infectious, highly contagious disease caused by a novel SARS-CoV-2

virus. SUF ¶ 20.[2] It can cause serious disease, hospitalization, and death. SUF ¶ 22. COVID-19 was declared a global pandemic in March 2020. SUF ¶ 23.

BHS kept all of its healthcare facilities open throughout the COVID-19 public health emergency, providing 24/7 care to residents and visitors. SUF ¶26. BHS needed to maintain a healthy staff to maintain those services and provide safe and high quality care in accordance with its charitable mission. SUF ¶ 27. BHS treated and cared for patients at higher risk of serious disease and death from COVID-19 than the general public, including elderly patients; cancer patients and others with immunosuppressive and other conditions that increased risk (e.g. obesity and diabetes mellitus); patients with severe heart and lung disease; pregnant patients; and pediatric patients who were not yet eligible to be vaccinated. SUF ¶ 28.

As BHS's Chief Medical Officer board-certified in infectious disease with extensive experience in infection control and quality, Dr. Lederer was responsible for making the system-wide clinical decisions and judgments he believed necessary to deliver care during the COVID-19 public health emergency in the safest manner reasonably possible. SUF ¶ 29. Dr. Lederer made those decisions and judgments in consultation with other members of BHS's senior clinical team based on the objective, scientific evidence then available. SUF ¶ 30. Dr. Lederer regularly monitored trusted sources of public health information about COVID-19 and the rapidly changing conditions during the pandemic, paying particular attention to the publications of the Centers for Disease Control and Prevention (the "CDC"), the leading national public health agency, and the Massachusetts Department of Public Health ("DPH"), the primary licensing authority under which BHS hospitals and clinics operate. SUF ¶ 31.

As a relatively small, community healthcare system, BHS employs no epidemiologists or

[2] For ease of reference, unless otherwise indicated, Defendants refer to both the SARS-CoV-2 virus and the COVID-19 disease that it causes as COVID-19.

public health statisticians. SUF ¶ 33. BHS relied upon CDC and DPH recommendations, guidance, orders and other publications to interpret the enormous number of studies and collections of data that scientists, epidemiologists, and public health experts were generating across the globe. SUF ¶ 34. DPH, in turn, "strongly encouraged" Massachusetts healthcare facilities to closely monitor the CDC website for up-to-date information and resources, which BHS did. SUF ¶ 32.

The risk of spread of COVID-19 within the BHS healthcare system presented a novel, substantial, and potentially deadly threat to the health of its patients, caregivers and other staff, their families, and other members of the BHS community. SUF ¶ 35. BHS employed unprecedented and varying measures to try to mitigate the spread and transmission of COVID-19, including at various times, among other infection control protocols: (i) mandatory masking of all staff, including N95 masks for interaction with patients with suspected or confirmed COVID-19 or confirmed exposure to COVID-19; (ii) required wearing of goggles by clinical staff when interacting with patients; (iii) mandatory screening of patients and visitors for COVID-19 symptoms; (iv) varying and sometimes strict limitations on patient visitors, including requiring video visits only for COVID-19 patients, except for limited end-of-life discussions and care; and (v) requiring visitors entering a BHS facility to wear BHS-issued medical grade face masks. SUF ¶ 36. When vaccines became available to healthcare workers in the Commonwealth in mid-December 2020, BHS immediately made them available to its staff in multiple locations, strongly encouraging all employees to take the vaccine. SUF ¶ 37.

By mid-2021, the CDC had identified COVID-19 vaccination of healthcare workers as a priority to mitigate the enormous burdens on healthcare facilities across the country, reporting that healthcare workers were at increased risk of exposure through patient interactions, and that

vaccination protected both healthcare workers and patients. SUF ¶¶ 38–39. BHS leadership was aware of reports that healthcare workers had higher rates of infection than people in other fields, with the CDC's having reported in early July 2021 that over 1,600 U.S. healthcare workers had died from COVID-19. SUF ¶ 40. Before vaccines became available, several BHS staff became seriously ill with COVID-19, requiring hospitalization at BMC. SUF ¶ 41. One employee required a transfer out-of-state for specialized treatment. *Id.* Tragically, there was at least one staff fatality from COVID-19. *Id.*

In July of 2021, despite the infection control protocols BHS had in place, COVID-19 hospitalizations at BHS began to increase with the circulation of the new Delta variant, which was reported to be more contagious, with some evidence it was more virulent than the previously-circulating Alpha variant. SUF ¶ 42. Predictions were that there would be a surge of COVID-19 cases during the winter of 2021-22, similar to the surge in COVID-19 hospitalizations that had occurred during the winter of 2020-2021, predictions that proved correct. SUF ¶¶ 43, 108-110.

BHS clinical leadership understood based on publications of the CDC and other trusted sources then available that not only were vaccinated individuals significantly less likely to become infected with COVID-19, but if infected (through a "breakthrough infection"), they were less likely to transmit the virus onward. SUF ¶ 44. BHS's clinical leadership also understood that while the vaccines were somewhat less effective against the Delta variant than against the Alpha variant, the vaccines continued to have substantial efficacy against infection with the Delta variant, and that they remained highly efficacious against serious illness, hospitalization and death. SUF ¶ 45.

In publications in July and August 2021 upon which BHS clinical leadership relied, the

CDC identified COVID-19 vaccination as "**a critical prevention measure to help end the COVID-19 pandemic,**" and confirmed that, although demonstrating somewhat lower efficacy against the Delta variant than against earlier variants, the vaccines retained substantial efficacy against symptomatic, laboratory-confirmed COVID-19 in adults across different populations, and high efficacy against severe illness and death. SUF ¶ 47 (emphasis added). The CDC also reported that (i) the Delta variant was nearly twice as contagious as previous variants with some evidence of increased illness severity, (ii) the greatest risk of transmission remained among unvaccinated people. and (iii) fully vaccinated people with Delta "breakthrough" infections appeared to be infectious for a shorter period than unvaccinated persons with Delta. SUF ¶ 51.

By July 30, 2021, Berkshire County had recorded over 580 COVID-19 cases that had been hospitalized, 4,500 COVID-19 cases that had not been hospitalized, and 238 reported COVID-19 deaths. SUF ¶ 48. According to a World Health Organization COVID-19 Weekly Epidemiological Update, as of July 25, 2021, over 193,000,000 COVID-19 cases and over 4,000,000 COVID-19 deaths had been reported worldwide. SUF ¶ 49. According to a CDC COVID Data Tracker Weekly Review dated July 30, 2021, as of July 28, 2021, close to 35,000,000 cases and over 609,000 deaths in the U.S had been reported. SUF ¶ 50.

**Unprecedented Staffing Challenges of the COVID-19 Pandemic**

The cumulative strain on BHS's operations and staff caused by the COVID-19 pandemic in 2021 was unprecedented. SUF ¶ 52. Staffing challenges were severe, with COVID-19- related absences significantly increasing overall staff absences. SUF ¶ 53. Staff absences began to increase significantly in August and September 2021 with the circulation of the more contagious Delta variant. SUF ¶ 54.

The cost of staff absences was substantial. SUF ¶ 55. BHS paid all staff for COVID-19 related absences without requiring them to use accrued sick time. *Id*. BHS had to engage traveler nurses and other traveler staff at a premium cost, but because there were healthcare staff shortages nationwide, travelers were difficult to secure, and their cost was at an unprecedented high. SUF ¶¶ 55-56. BHS spending for contract labor (i.e. traveler) registered nurses exploded in 2021, quadrupling from just over $5 million at the start of FY2021 (10/1/2020) to over $20 million at the start of FY2022 (10/1/2021), due to (i) BHS's increased need for travelling nurses and (ii) an historic spike in the hourly rate for travelling nurses due to high demand and low supply. SUF ¶ 57. There were also large spikes in contract labor costs for advanced practice providers (including nurse practitioners and physician assistants) over the same period, and for non-exempt staff. SUF ¶ 58.

In addition to cost, staff absences threatened the ability of BHS to deliver services. SUF ¶ 59. BHS staff were asked to make extraordinary efforts during the COVID-19 public emergency. SUF ¶ 60. To cover for absent staff, they were asked to work additional or different shifts, and to cancel or delay vacations. *Id.* Staff were required to redeploy from units on which they typically worked to different units/departments to provide help to those units/departments that were understaffed. *Id.* To address severe staffing shortages in patient care positions that threatened patient safety, BHS offered, at significant cost, extra shift incentives for those willing to pick up extra shifts, but those incentives did not fix staff fatigue, and significant staff shortages continued in most roles. SUF ¶¶ 61-62.

**MHA Endorses Mandatory Vaccines**

On July 29, 2021, the Board of Trustees of the Massachusetts Health and Hospital Association (an association of Massachusetts hospital and health systems of which BHS was a

member) issued a Policy Statement calling for mandatory COVID-19 vaccination of healthcare workers as being in the best interest of public health and safety of patients and healthcare workers, stating: "**The science is clear. Vaccination against COVID-19 is the most effective way to prevent its spread and to keep our patients, our staff, our families and our communities safe.**" SUF ¶¶ 64-65.

**BHS Mandatory COVID-19 Vaccination Policy**

By July 30, 2021, approximately 80% of BHS employees had voluntarily taken the vaccine, but approximately 800 employees – or approximately 20% of BHS's workforce – remained unvaccinated. SUF ¶ 66.

On August 4, 2021, the Massachusetts Commissioner of Public Health issued COVID-19 Public Health Emergency Order No. 2021-4, reporting 672,488 confirmed cases of COVID-19, and 17,714 deaths in the Commonwealth. SUF ¶ 67. In that Order, the Commissioner recognized vaccines as "**the most effective method for preventing and mitigating infection from COVID-19, including possible hospitalization or death.**" SUF ¶ 68 (emphasis added).

Two days later, on August 6, 2021, BHS announced its mandatory COVID-19 vaccination policy (the "BHS Vaccination Policy"), joining many other healthcare systems in the Commonwealth and across the country in requiring COVID-19 vaccines. SUF ¶¶ 69-70.[3] BHS senior leadership issued the policy for the purpose of protecting the safety and health of BHS patients, staff, and visitors, minimizing already serious staff shortages, protecting BHS's ability

[3] While at the time of the announcement, the COVID-19 vaccines were being administered under an Emergency Use Authorization ("EUA"), BHS understood that FDA approval of at least one of the COVID-19 vaccines was expected by October 1, 2021, the date by which the BHS Vaccination Policy required vaccination. SUF ¶ 71. On or about August 23, 2021, BHS learned that the FDA had given its full approval of the first mRNA vaccine (known as the Pfizer-BioNTech COVID-19 Vaccine) for prevention of COVID-19. SUF ¶ 72.

to provide critical health care services, and promoting the public's trust. SUF ¶ 74.

The BHS Vaccination Policy applied to all employees, volunteers, and contractors of all BHS-controlled affiliates. SUF ¶ 76. It permitted employees to request an exemption to the vaccine requirement for a religious or medical reason, and it allowed for the consideration of possible reasonable accommodations subject to BHS's right to deny accommodations if necessary to protect the safety of patients, visitors, and staff. SUF ¶ 77. Written requests for exemption and accommodation had to be submitted by September 15, 2021; the date by which employees had to be fully vaccinated was October 1, 2021. *Id.*

**PPE Protection Not Enough**

BHS leadership understood that while Personal Protective Equipment ("PPE"), such as masking, helped to reduce the risk of infection and transmission, PPE was not 100% effective, and that proper use of PPE combined with vaccination provided substantially better, layered protection for BHS patients and staff. SUF ¶ 78. BHS leadership was aware of studies showing transmission of the COVID-19 virus in health care settings despite the use of PPE (including masks and eye protection). SUF ¶ 79. Pre-vaccines, BHS had itself experienced at least one COVID-19 "cluster" outbreak at BMC, and it was aware of significant cluster outbreaks at other healthcare facilities despite strict policies on the use of masks and other infection control protocols. SUF ¶ 81.

**September 2021 Reasonable Accommodation Decision**

BHS's announcement of the BHS Vaccination Policy in early August caused many, but not all, of its unvaccinated employees to take the vaccine. SUF ¶ 82. By August 31, 2021, approximately 90% of the BHS workforce had been vaccinated, leaving approximately 400 employees unvaccinated. SUF ¶ 83. BHS leadership remained very concerned about the

increased risk of COVID-19 infection, transmission, and potentially serious illness and death each unvaccinated employee posed to patients, other staff, visitors, and the employees themselves. SUF ¶ 84.

In early September 2021, then President Biden announced that the Centers for Medicare & Medicaid Services ("CMS"), in collaboration with the CDC, was drafting emergency regulations requiring vaccinations for workers in hospitals, dialysis facilities, ambulatory surgical settings, and home health agencies, among others, as a condition for participating in the Medicare and Medicaid program. SUF ¶ 85. In announcing the anticipated rule, Xavier Becerra, then Secretary for the United States Department of Health and Human Services stated: "**There is no question that staff, across any health care setting, who remain unvaccinated pose direct and indirect threats to patient safety and population health. Ensuring safety and access to all patients, regardless of their entry point into the health care system, is essential.**" SUF ¶ 86 (emphasis added). CMS Administrator Chiquita Brooks-LaSure stated: "**As the Delta variant continues to spread, we know the best defense against it lies with the COVID-19 vaccine. Data show that the higher the level of vaccination [is] among providers and staff, the lower the infection rate is among patients who are dependent upon them for care.**" *Id.* (emphasis added).

On September 10, 2021, the CDC posted a study by H. Scobie et al. (the "Scobie Study") reporting a substantial level of effectiveness of the COVID-19 vaccine against infection by the then-circulating Delta variant, and the even higher level of protection against serious illness, hospitalization, and death. SUF ¶ 87. The CDC had also published a widely-circulated graphic based on the data in the Scobie Study that showed that the COVID-19 vaccine reduced the risk of infection by the Delta variant by 5 times, and reduced the risk of hospitalization and death by

over 10 times (the "CDC Graphic"). SUF ¶ 88.

While BHS was too small to conduct any independent study of its own healthcare staff and patient population that would have been statistically significant (even assuming BHS had had that expertise and resources), its own experience was consistent with what the CDC and DPH were reporting about the high efficacy of the vaccine against severe illness and hospitalization. SUF ¶ 89. The overwhelming majority of COVID-positive inpatients at BHS hospitals in the fall and winter of 2021 were either unvaccinated or immunocompromised. *Id.*

In an updated September 15, 2021 Science Brief, the CDC confirmed that the Delta variant of the virus was then prevalent, with evidence of increased transmissibility. SUF ¶ 90. While noting that additional investigation was needed to assess the risk of transmission from fully vaccinated persons with SARS-CoV-2 infections to other vaccinated and unvaccinated people, the CDC noted that SARS-CoV-2 transmission between unvaccinated persons was "the primary cause of continued spread." *Id.* It reported that the vaccines continued to demonstrate significant efficacy against symptomatic, laboratory-confirmed COVID-19 in adults, high efficacy against COVID-19 severe enough to require hospitalization, and similarly high efficacy against COVID-19-associated death. *Id.* It further noted that "evidence suggests fully vaccinated people who become infected are infectious for shorter periods of time than unvaccinated people infected with Delta." *Id.* The CDC reiterated that efforts to maximize vaccination "remain[ed] critical to ending the COVID-19 pandemic." *Id.*

By September 20, 2021, approximately 87 BHS employees had submitted written requests for exemptions based on religious or medical grounds, requesting accommodations to work unvaccinated. SUF ¶ 91. BHS senior leadership – including Dr. Lederer and Mr. Borek, with the approval of then BHS CEO David Phelps and CFO Darlene Rodowicz – made the

decision at that time that BHS employees who could not perform their essential job functions entirely remotely would not be permitted to work unvaccinated. SUF ¶ 92.

In making that decision, BHS leadership understood based on objective, scientific data and studies reported by the CDC and other reliable sources – including, among others, the Scobie Study and the CDC Graphic – that (i) asymptomatic, pre-symptomatic and symptomatic staff could transmit the virus; (ii) healthcare workers were at increased risk of contracting SARS-CoV-2 infections; (iii) unvaccinated staff were 5 times more likely than vaccinated staff to become infected with the SARS-CoV-2 virus, and, if infected, also more likely to transmit the disease to others; and (iv) those who were unvaccinated were more than 10 times more likely to become seriously ill, hospitalized, or die. SUF ¶ 93. Based on that understanding, BHS senior leadership determined that allowing unvaccinated staff to work in BHS facilities would pose a direct threat to patients, co-workers and visitors, would exacerbate staff shortages, would jeopardize BHS's ability to serve its community, and would undermine the public's trust. SUF ¶ 94.

In making this decision, BHS leadership recognized its heightened responsibility to provide the safest care reasonably possible for its patients, to take all reasonable steps to protect the health and safety of its staff, and to promote the health and wellness of its community. SUF ¶ 95. Staffing shortages remained widespread, and the highly transmissible and virulent Delta variant was surging, with an expectation that cases would continue to rise during the winter months. SUF ¶ 96. Increased risk of infection among BHS staff meant increased risk of absenteeism when BHS's resources were already seriously strained. SUF ¶ 97. BHS leadership determined that permitting unvaccinated employees to provide direct patient care or to work with others in BHS facilities would increase the risk of staff absenteeism, exacerbating already critical

staff shortages, and jeopardizing its ability to continue to serve the health care needs of its community. SUF ¶ 98.

BHS leadership also determined that permitting employees whose jobs could not performed entirely remotely would have undermined the public's confidence in the safety of BHS's healthcare facilities, resulting in patients' avoiding or delaying the care that they needed. SUF ¶ 99-100. Concerns about unvaccinated staff working in BHS facilities had been expressed to senior leadership by BHS patients and members of the public, as well as its own staff. SUF ¶ 101.

For all of these reasons, BHS made the determination that the risks and resulting hardships that would result from allowing unvaccinated employees to work at BHS facilities were too high. SUF ¶ 102. For BHS senior leadership, even one preventable death caused by an unvaccinated BHS employee would be one too many. SUF ¶103.

**Prior Infection No Substitute for Vaccination**

BHS clinical leadership did not view prior infection with COVID-19 as an adequate substitute for vaccination. SUF ¶ 104. There was evidence that natural immunity provided protection against reinfection for 90 days, and BHS allowed limited medical accommodations for that period following a confirmed positive COVID-19 test. SUF ¶ 105. There was, however, no test that could determine the degree and length of protection afforded by natural immunity thereafter, and the CDC recommended vaccines for everyone, including those who had been previously infected. SUF ¶ 106-107. On August 6, 2021, the CDC had published a scientific study by Cavanaugh et al. (the "Cavanaugh Study") reporting that unvaccinated people who had had COVID-19 were 2 times as likely as fully vaccinated people to get COVID-19 again. SUF ¶ 107.

**Individual Requests for Accommodations**

After BHS leadership made their judgment in late September 2021 that permitting staff to work at BHS facilities unvaccinated posed too high a risk, BHS HR staff conducted individual meetings with each BHS employee (including each of the current Plaintiffs) who had sought an accommodation to review their job duties and determine whether the employee could perform their job entirely remotely, or whether a temporary leave or extension of time to become vaccinated was possible. SUF ¶ 112. Out of the original 87 written accommodation requests, 10 employees were permitted to work remotely, or given temporary leave or an extension of time to become vaccinated. SUF ¶ 113. Of those ten, five had applied for religious exemptions and five had applied for medical exemptions. Id. No BHS employee was granted an accommodation that would have permitted them to work in a BHS facility unvaccinated. SUF ¶ 114.

None of the Plaintiffs could perform their essential job functions remotely. SUF ¶ 116. Each of the Plaintiffs provided direct care to patients, and each cared for multiple patients during every shift. SUF ¶ 117. If infected, any one of those Plaintiffs could have transmitted the virus to multiple patients and staff, who could have in turn transmitted the virus to multiple additional people. SUF ¶ 118. Given the particular vulnerability of BHS's patient population, any one of those transmissions could have resulted in serious illness or death. SUF ¶ 119.

The only plaintiff who requested remote work as an accommodation was Colleen Henry who suggested that she could perform her job by "seeing" patients only over telehealth. SUF ¶ 121. BHS leadership considered Ms. Henry's request, but determined that the volume of patients appropriate for telehealth encounters was insufficient to support Ms. Henry's 40 hour/week position. SUF ¶ 122. While Ms. Henry also suggested that she could assist with Urgent Care virtual visits, Urgent Care providers conducted virtual visits from the Urgent Care facilities,

seeing patients in person between virtual appointments. *Id.* Physical exams could not be performed by telehealth, and conducting physical exams in person was an essential function of Ms. Henry's position as a physician assistant. SUF ¶ 123. In addition, physician assistants required physician supervision, and those physicians were at Williamstown Medical facilities, which remained open for in-patient visits throughout the pandemic. SUF ¶124-125.[4]

**Plaintiffs' Requests for Accommodation would have Caused an Undue Hardship**

BHS understood from the objective scientific evidence described above that each Plaintiff was (i) five times as likely to be infected with the virus as a vaccinated employee and, once infected, more likely than an infected vaccinated person to transmit the virus to a patient or other staff member, (ii) more likely to be infectious for a longer period, (iii) more likely to be absent (because of the higher risk of infection) and once infected, more likely to be absent for a longer period, and (iv) more than 10 times more likely to suffer serious illness or die from COVID-19. SUF ¶ 126. BHS leadership considered this increased risk to be substantial in the context of its health care operations and a substantial hardship. SUF ¶ 127. BHS leadership was unwilling to subject any one of its patients or staff to the increased risk of contracting COVID-19 from having Plaintiffs continue to work in BHS facilities unvaccinated. SUF ¶ 128. Exposing patients and staff to those increased health risks would have been inconsistent with BHS's charitable mission, and was a risk that BHS leadership determined was much too high to accept. SUF ¶ 129.

[4] While Ms. Henry contends that telehealth appointments were common at Williamstown Medical in the early months of the pandemic, in-person appointments were offered at Williamstown Medical throughout the pandemic. By the summer of 2021, the overwhelming majority of Ms. Henry's patient visits were in-person visits. SUF ¶ 125. *Cf. Beckles v. N.Y.C. Dep't of Educ.*, No. 23-cv-8663, 2025 U.S. Dist. LEXIS 149503, at *8-9 (E.D.N.Y. August 4, 2025) (Title VII did not obligate public school to allow special education teacher to work remotely even though remote work was allowed during the 2020-2021 year; once school transitioned back to in-person learning, essential job functions included in-person work).

# ARGUMENT

## I. Summary Judgment Standard

Summary judgment is appropriate where the evidence shows there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.,* 950 F. 2d 816, 822 (1st Cir. 1991) (citations omitted). The burden is on the moving party to show, through the pleadings, discovery, and affidavits, that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Once the moving party meets that burden, the non-movant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation. *E.g.*, *Fonanez-Nunez v. Janssen Ortho LLC,* 447 F. 3d 50, 54-55 (1st Cir. 2006) (citations omitted). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. *Anderson,* 477 U.S. at 248.

## II. Plaintiffs' requests for accommodation under Title VII and the ADA posed an undue hardship because of increased risk to patient, staff and visitor health and safety.

Plaintiffs claim that BHS violated Title VII and the ADA by denying their requests to work unvaccinated as reasonable accommodation. But an employer is not required under Title VII or the ADA to make a reasonable accommodation to an employee if doing so would cause undue hardship. *Groff v. DeJoy,* 600 U.S. 447, 468 (2023); *TWA v. Hardison,* 432 U.S. 63, 84 (1997) (Title VII); *EEOC v. Amego, Inc.* 110 F. 3d 135, 148-149 (1st Cir. 1997) (ADA).

In *Groff*, 600 U.S. at 468 (2023), the Supreme Court clarified the *"de minimis"* undue hardship standard developed under *TWA v. Hardison*, holding that undue hardship is "shown when a burden is substantial in the overall context of an employer's business." An employer establishes undue hardship by demonstrating that a religious accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470.

In the context of the COVID-19 pandemic, both the courts and the Equal Employment Opportunity Commission ("EEOC") have reaffirmed that "costs" are not limited to monetary costs; "costs" include safety risks and damage to reputational interest. *See*, *e.g.*, C*yr v. Bos. Med. Ctr.,* 22-cv-11930, 2025 U.S. Dist. LEXIS 11168, at *14 (Kobick, J.) (D. Mass., January 22, 2025) ("[r]elevant non-economic costs include health and safety risks as well as risk of reputational injury); *Hall v. Sheppard Pratt Health Sys.,* 749 F.Supp. 3d 532, 546-47 (D. Md. 2024) (appearance that defendant health system "was not prioritizing the safety of its patients and staff could have eroded public trust, an essential for any health care facility"), *appeal docketed*, No. 24-208 (4th Cir. 2024); EEOC, *What You Should Know about COVID-19 and the ADA, the Rehabilitation Act, and other EEO Laws,* § L (March 1, 2022) (the "EEOC COVID-19 Guidance") (risk of spread of COVID-19 to other employees or public are factors to be considered in undue hardship analysis). *See also Together Employees v. Mass General Brigham Inc.,* 573 F. Supp. 3d 412, 433 (2021) ("reasonable for [hospital] to conclude that unvaccinated employees—who are more likely to become infected—posed a direct threat to patients and others"), *aff'd*, 32 F.4th 82 (1st Cir. 2022); *Cloutier v. Costco Wholesale Corp.,* 390 F. 3d 126, 134-37 (1st Cir. 2004) (recognizing negative impact on public image and reputation as a proper consideration in undue hardship analysis).

It is undisputed that BHS leadership relied on objective, scientific evidence, including publications of the CDC and DPH, in determining that unvaccinated staff posed substantial health and safety risks to BHS's patients, staff, and visitors. SUF ¶ 126. BHS understood from those trusted sources that the vaccine was a "critical" prevention measure (SUF ¶ 47, 90), and the "best defense" (SUF ¶ 86) against infection and transmission, with each unvaccinated Plaintiff (i) five times as likely to be infected with the virus than a vaccinated employee and, once infected, more likely than an infected vaccinated person to transmit the virus to a patient or other staff member, (ii) more likely to be infectious for a longer period, and (iii) more than 10 times as likely to suffer serious illness or die from COVID-19 (SUF ¶¶ 88, 93, 126). Given the particularly vulnerable population that BHS served (SUF ¶¶ 5-7), and its obligation and charitable mission to protect its patients and staff from reasonably preventable risks of infection and disease (SUF ¶¶ 2-3, 95, 127-29), no reasonable fact finder could find that BHS acted unreasonably in finding these health and safety risks to be substantial.

In two recent decisions – *Rodrique v. Hearst Commc'ns, Inc.,* 126 F.4th 85 (1st Cir. 2025) and *Melino v. Bos. Med. Ctr.,* 127 F.4th 391 (1st Cir. 2025) – the First Circuit affirmed the grant of summary judgment to employers who had relied on CDC and other trusted sources to deny requests for COVID-19 vaccine exemptions on the grounds of undue hardship. In *Rodrique,* the plaintiff, a photographer for a broadcast television station, was terminated after refusing to take the COVID-19 vaccine on religious grounds. The defendant employer had determined that allowing Rodrigue to work unvaccinated created a significant risk of substantial harm to the health or safety of its employees, and so would have been an undue hardship. In affirming the grant of summary judgment, the First Circuit rejected the plaintiff's argument that to prevail on its undue hardship defense, the employer was required to prove that the COVID-19 vaccine

actually protects against the transmission of COVID-19, holding instead that because the undisputed record demonstrated that the employer relied "on the objective, scientific information available to [it]," with particular attention to "the views of public health authorities," it acted reasonably as a matter of law when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees. *Id.* at 91. The First Circuit cited as an authority upon which the employer could reasonably rely the CDC's Interim Public Health Recommendations for Fully Vaccinated People (July 21, 2021)—a publication upon which BHS clinical leadership likewise relied (SUF ¶ 46) – and cited the EEOC COVID-19 Guidance for the proposition that it would be proper to consider "the risk of the spread of COVID-19 to other employees or to the public" as a cost of permitting unvaccinated employees to remain in the workplace. *Id.* at 92-93.[5] The Court noted that at oral argument, Rodique "forthrightly conceded" that if undisputed record evidence demonstrated that the COVID-19 vaccine reduced the likelihood of virus transmission, the employer would prevail in establishing undue hardship. *Id.* at n. 2. On the question of vaccine efficacy, the Court held that it was reasonable as a matter of law for the employer to rely upon CDC sources "to conclude that the vaccine reduces the likelihood of transmitting the virus, and therefore that exempting employees from the vaccination requirement would pose a threat to the health of others." *Id.* at 93.

In *Melino,* the plaintiff was, like the Plaintiffs here, a healthcare worker who provided direct patient care. The hospital employer denied Melino's requested accommodation to work unvaccinated on the ground, among others, that permitting her to work unvaccinated would have increased the risk of COVID-19 transmission among staff and patients, and therefore would have resulted in an undue hardship. In affirming the grant of summary judgment, the First Circuit

[5] The *Rodrique* Court held that it could take judicial notice of what information was available on government websites at the time. *Id.* at n 3.

noted it was undisputed that the defendant relied upon CDC recommendations that "vaccination was the best way to protect against severe illness, hospitalization, and death and reduce the transmission of COVID-19," citing CDC recommendations that (i) all healthcare personnel get vaccinated because of their increased risk of infection, (ii) "'vaccines reduce the risk of COVID-19, especially severe illness,'" (iii) vaccines "offer 'protection against symptoms' and 'also help avoid people get[ting] infected with the virus'," and (iv) healthcare professionals be prioritized for COVID-19 vaccination "'to maintain provision of critical services and reduce the spread of infection'" (*id*. at 394 & n.1). Those same CDC studies, findings and recommendations were among the ones upon which BHS clinical leadership similarly relied. SUF ¶¶ 34, 38-39, 44-47, 51, 75, 87-88, 93.[6] As it had in *Rodrigue*, the Court rejected Melino's argument that the employer had to prove that the vaccines prevented infection and transmission of COVID-19 because it was uncontroverted, as it is here, that the employer had relied on CDC recommendations describing the vaccines "as mitigating the effects and spread of COVID-19." *Id.* at 397-98. While the plaintiff contended that disputes of material fact existed as to the extent and duration of vaccine protection, the plaintiff admitted, as had the plaintiff in *Rodrique*, that if vaccines worked, the employer would be able to establish undue hardship. *Id.* at 397.[7]

Massachusetts federal district courts, like those around the country, have recognized that in matters of patient safety, courts should defer to a hospital's judgment. *See, e.g.*, *Taylor v.*

---

[6] To the extent not already part of the record in the case, the First Circuit again took judicial notice of the CDC recommendations and studies posted on the CDC website. *Melino*, 127 F.4th at 394, n.1.

[7] In challenging the efficacy of the vaccine, Melino proffered a May 10, 2021 letter from Rear Admiral Hinton of the Federal Drug Administration, which acknowledged that the vaccine's effectiveness was not known "with absolute certainty." The First Circuit held (i) the letter did not dispute the CDC's conclusions that the available scientific evidence established that the vaccine reduced the risk of infection and onward transmission, and (ii) the hospital was not required to prove that vaccines work with absolute certainty or the extent or duration of their efficacy. *Id.* at 397-98.

*Milford Reg'l Med. Ctr., Inc.,* No. 4:23-CV-40009-MRG*,* 2024 U.S. Dist. LEXIS 85111, at *16 (D. Mass. May 10, 2024) ("hospitals are uniquely positioned when balancing different responses to the outbreak of disease and should be afforded 'substantial deference' when making determinations about appropriate measures to cope with a worldwide pandemic") (citations omitted); *Panozzo v. Riverside Healthcare*, No. 21-cv-2292, 2022 U.S. Dist. LEXIS 238545, at *25 (C.D. Ill. Jan. 2, 2022) (declining to substitute court's opinion for hospital's assessment of how to avoid undue hardship and continue serving its patients), *cited with approval in Miller v. Charleston Area Med. Ctr***.**, No. 2:23-cv-00340, 2024 U.S. Dist. LEXIS 189182, at *11-12 (D. W. Va. Oct. 17, 2024), *appeal docketed*, No. 24-2129 (4th Cir. 2024); *Together Employees*, 573 F.Supp. 3d at 433 (court should not second-guess hospital's judgment in matters of patient safety). *See also EEOC v. Amego, Inc.,*110 F.3d 135, 147 (1st Cir. 1997) (recognizing reluctance of court to substitute its judgment for that of medical center in matters relating to patient safety).

Here, BHS leadership made the clinical judgment in the fall of 2021 that the unvaccinated Plaintiffs posed too high a risk to the health and safety of BHS patients, its staff and others. SUF ¶ 127-129. That judgment, reasonably made based on the recommendations and findings of the CDC and other trusted sources, should not now be second-guessed.

Since December of 2023, there have been at least 14 federal district court COVID-19 decisions in Massachusetts (in addition to First Circuit decisions in *Rodrique* and *Melino*) granting summary judgment to employers who denied employee requests to work unvaccinated on undue hardship grounds.[8] One decision particularly instructive here is *Munroe v. Bos. Med. Ctr.,* No. 22-11935-FDS, 2025 U.S. Dist. LEXIS 131061 (D. Mass. July 10, 2025) (Saylor, J.). In *Munroe*, the Plaintiff, a staff nurse employed by Boston Medical Center, requested an

[8] Those cases are listed in the Case Appendix, attached hereto.

exemption from the hospital's vaccination policy because of her religious beliefs. The hospital denied her request on the ground that she did not qualify for an exemption, but even if she did, the requested accommodation of working unvaccinated would result in an undue hardship to the hospital.[9] In determining that the hospital has established undue hardship, Judge Saylor observed: "It can hardly be disputed that a hospital is entitled to rely upon, and apply, medical and scientific evidence in the development and enforcement of its policies and procedures, and that prevention of infection is of paramount importance." *Id.* at *17. Rejecting the plaintiff's contention that the hospital was required to prove that the vaccines worked, the Court held "the efficacy of the COVID vaccines – or their purported inefficiency – is not relevant to the issue of undue hardship. The issue is the reasonableness of the employer's decision based on the knowledge and evidence available to it at the time." *Id.* at *18. Noting that the hospital had "an obligation to protect its patients and staff from reasonably preventable risks of infection and disease," the Court held that the hospital acted reasonably in determining that it could not provide the requested accommodation without undue hardship. *Id.*

Here, BHS, like Boston Medical Center in *Munroe*, determined that reducing the risk of infection and subsequent transmission of the virus by its staff to patients and other staff was paramount. SUF ¶ 128. BHS, like Boston Medical Center in *Munroe*, reasonably determined based on CDC recommendations, studies and guidance – including the Scobie Study and CDC Graphic – that allowing unvaccinated staff to work in its facilities would put patients and staff at substantially (5 times) increased risk of infection and onward transmission. SUF ¶ 126. It would also put staff at substantially (more than 10 times) increased risk of severe illness, hospitalization

[9] Here, Defendants never finally determined whether the Plaintiffs were eligible for religious exemptions; they denied the Title VII Plaintiffs' requests for accommodations on undue hardship grounds. SUF ¶ 115.

and death. SUF ¶ 126. That determination was a reasonable one as a matter of law and, in the context of BHS's operation and mission, conclusively establishes undue hardship.[10]

Defendants anticipate that Plaintiffs will proffer opinions of their expert Dr. Harvey Risch to suggest issues of fact exist regarding the degree of efficacy of the COVID-19 vaccines in preventing infection and onward transmission of the SARS CoV-2 virus. Those opinions are neither relevant nor reliable for the reasons set forth in Defendants' Memorandum in Support of Motion to Exclude (ECF No. 66) and Reply Memorandum in Support of Motion to Exclude (ECF No. 78) to which the Defendants respectfully refer the Court.[11] Since Defendants filed their Reply Memorandum in Support of Motion to Exclude, a third federal district court decision has issued, *Zimmerman v. PeaceHealth*, No. 3:22-cv-05960, 2025 U.S. Dist. LEXIS 165998 (W.D. Wash. August 26, 2025), rejecting Dr. Risch's opinions relating to the efficacy of the COVID-19 vaccines and breakthrough infections as not creating a disputed issue of material fact, and granting the employer's motion for summary judgment on undue hardship.[12]

---

[10] In addition to the First Circuit, Courts of Appeals in the Third, Sixth, and Ninth Circuits have also affirmed in COVID-19 mandatory vaccination cases the grant of summary judgment to employers on undue hardship grounds. *See Petersen v. Snohomish Reg'l Fire,* No. 24-1044, 2025 U.S. App. LEXIS 22477, at *25 (9th Cir. September 2, 2025) (fire and rescue service established undue hardship based upon the risk to the health and safety of its own firefighters and the public, the large number of firefighters seeking accommodations, the risk to operations, the cost of widespread absences, the loss of a state contract, and the risk of additional liability); *Bushra v. Main Line Health, Inc.,* No. 24-1117, 2025 U.S. App. LEXIS 8421 (3rd Cir. April 10, 2025) (non-binding precedent) (hospital employer denied exemption to physician); *Kizer v. St. Jude Child.'s Rsch.. Hosp.*, No. 24-5207, 2024 U.S. App. LEXIS 29429, at *20-24 (6th Cir. Nov. 18, 2024) (unpublished) (hospital denied exemption to Electronic Health Record Applications Analyst; court rejected as conclusory with no factual underpinnings affidavit of plaintiff's supervisor that plaintiff's job could be performed remotely).

[11] As briefed in Defendants' Reply Memorandum in Support of their Motion to Exclude (p.4), Dr. Risch conceded in his deposition that the COVID-19 vaccines reduced risk of infection by the virus and does not dispute that the Scobie Study and CDC Graphic reported that vaccinated individuals were approximately 5 times less likely to be infected with the virus than unvaccinated individuals. Heightened risk of infection necessarily leads to heightened risk of onward transmission as only the infected can transmit the virus.

[12] The prior two decisions rejecting Dr. Risch's opinions (cited in Defendants' Motion to Exclude

## III. **Plaintiff Quillen cannot establish a prima facie case under the ADA**

Christine Quillen is the sole remaining Plaintiff who asserted a medical ground for an exemption, and she asserts a failure to accommodate claim under the ADA. To bring a claim under the ADA, a plaintiff must establish as part of their prima facie case that they are a "qualified individual". A plaintiff is not a qualified individual if they pose a "direct threat" to the health or safety of other individuals in the workplace. 42 U.S.C. § 12113(b). The term "direct threat" means "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111. "A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate the risk." *School Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 288 & n.16 (1987). Plaintiff Quillen carries the burden of establishing her ability to safely perform the essential functions of her job with the accommodation requested. *EEOC v. Amego, Inc.,* 110 F.3d at 144 (if essential job functions implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a manner that will not endanger others); *Adams v. Mass Gen. Brigham Inc.,* No. 21-11686-FDS, 2023 U.S. Dist. LEXIS 174606, at *22 (D. Mass. September 28, 2023) (Saylor, J.) (same).

---

memoranda) are *Nilsen v. University of Washington Med. Ctr.*, No. C23-1498 MJP**,** 2024 U.S. Dist. LEXIS 204236, at *39 (W.D. Wash. November 8, 2024), and *Luxton v. Wash. State VA.*, No. 3:23-cv-05238-DGE, 2025 U.S. Dist. LEXIS 54161, at *44-47 (W. D. Wash. March 24, 2025) . In an even more recent decision, *Strandquist v. Wash. State Dep't. of Soc.,* No. 3:23-cv-05071, 2025 U.S. Dist. 165994, at * 20-21 (W.D. Wash. August 27, 2025), the Court granted the defendant employer's motion *in limine* to exclude evidence respecting the employer's later decision not to require employees to receive boosters as irrelevant to the issue of undue hardship. Dr. Risch similarly seeks to advance a booster argument here, arguing that BHS's decision (made after its accommodation decision) not to mandate boosters somehow demonstrates that BHS took COVID-19 infection risk in September 2021 "in stride" and so, in Dr. Risch's opinion, BHS could not have considered the increased infection risk resulting from unvaccinated staff an undue hardship. See Defendants' Memorandum in Support of Motion to Exclude (ECF No. 66), p. 14-15 & n.11. As the recent decision in *Strandquist* affirms, the booster argument is irrelevant to the issue of undue hardship when BHS made its earlier accommodation decision.

Because Plaintiff Quillen presented an increased risk of infection and onward transmission of the COVID-19 virus (*see* pp. 19-26, *supra*), she constituted a direct threat to the health or safety of others, and so she cannot establish her prima facie case under the ADA as a "qualified individual with a disability." *McCarthy v. Mass. Dep't of Child.*, No. 23-11258, 2025 U.S. Dist. LEXIS 77207, at *4-5 (D. Mass. April 23, 2025) (summary judgment warranted on ADA claim on grounds that plaintiff failed to establish that she was a "qualified individual with a disability" because at time COVID-19 vaccine exemption request was denied, "the general medical consensus (based on objective data provided by public health authorities) was that vaccination was more effective in preventing transmission of the virus than masking and testing alone"), *appeal docketed*, No. 25-1508 (1st Cir. 2025).

## IV. Increased risks of (i) exacerbating staff shortages, (ii) jeopardizing BHS operations, and (iii) undermining public trust also constitute undue hardship under both Title VII and the ADA.

Based upon the available objective, scientific evidence, BHS reasonably believed that permitting the Plaintiffs to work unvaccinated would have risked exacerbating already critical staffing shortages due to increased risk of absenteeism. SUF ¶¶ 96-98. In addition to the substantial costs that BHS would have had to incur to cover those absences particularly given the short supply of staff nationwide (SUF ¶ 56), increased absenteeism would have jeopardized BHS's ability to provide critical medical care to its patients (SUF ¶ 98). BHS also reasonably believed that allowing unvaccinated workers to work in its facilities would have undermined the public's confidence in the safety of those facilities, causing patients to avoid or delay care (SUF ¶ 99).

Increased labor costs and operational challenges of staffing shortages during the COVID-19 pandemic, and risk of reputational harm are recognized elements of undue hardship. *See*, *e.g.*,

*Hall v. Sheppard Pratt Health Sys.,* 749 F.Supp. 3d at 547 (allowing employee to remain unvaccinated would have entailed substantial financial costs and "substantial patient, employee, and public safety risks as well as reputational harm for the health system" and "easily satisfy[ied] the [undue hardship] standard as articulated in *Groff*"), *appeal docketed* , No. 24-2048 (4th Cir. 2024)*; Hailey v. Legacy Health,* No. 3:23-cv-00149-IM, 2024 U.S. Dist. LEXIS 170083, at *24 (D. Or. Sept. 20, 2024) ("Consistent with the pre- and post-*Groff* authority, this Court holds that it is appropriate to consider . . . non-economic costs, like the cost to an employer's mission . . . in analyzing undue hardship."); *Cruz v. Bd. of Regents of Univ. of N.M*., No. 23-986 GJF/KRS, 2024 U.S. Dist. LEXIS 201456, at *34 (D. N.M. Nov. 5, 2024) (concluding that an unvaccinated and untested employee working in a congregate care setting imposed an undue hardship on the hospital's business and mission).

## CONCLUSION

The undisputed facts demonstrate that Defendants reasonably determined that Plaintiffs' requested accommodations would have resulted in undue hardship based upon their understanding, grounded in objective, scientific evidence, that the accommodations would have resulted in (i) increased risks to health and safety of patients, staff and others, (ii) increased risks of staff shortages resulting substantial increases in labor costs, and jeopardizing BHS's ability to continue to provide critical services, and (iii) the risk of undermining the public's trust in its community health system. Accordingly, Defendants respectfully request that their Motion for Summary Judgment dismissing all claims be granted.

September 3, 2025

Respectfully submitted,

BERKSHIRE HEALTH SYSTEMS, INC.,
BERKSHIRE MEDICAL CENTER, INC.,
BERKSHIRE FACULTY SERVICES,
INC., AND FAIRVIEW HOSPITAL,

By their attorneys,

*/s/ Lucy Prashker*
Lucy Prashker (BBO# 405880)
Susan P. Herman (BBO# 708851)
Cain Hibbard & Myers PC
66 West Street, Suite 300
Pittsfield, Massachusetts 01201
(413) 443-4771
lprashker@cainhibbard.com
sherman@cainhibbard.com

**CERTIFICATE OF SERVICE**

I, Lucy Prashker, certify that, on September 3, 2025, a copy of the foregoing document is being delivered by the CM/ECF system to counsel for plaintiffs:

Brian Unger, Esq.
The Law Offices of Warner Mendenhall, Inc.
brian@warnermendenhall.com

*/s/ Lucy Prashker*
Lucy Prashker

**Case Appendix**

*Geronimo v. Melrose-Wakefield Healthcare Corp.*, No. 1:23-cv-11138-JEK, 2025 U.S. Dist. LEXIS 139786, at *13-18 (D. Mass. July 22, 2025) (Kobick, J.) (undue hardship demonstrated based upon hospital's determination (based on CDC findings) that unvaccinated workers would pose an increased risk of COVID-19 transmission to patients and other staff, impeding hospital's ability to maintain adequate staffing, and harming its reputation for providing safe healthcare to patients)

*Munroe v. Bos. Med. Ctr.,* No. 22-11935-FDS, 2025 U.S. Dist. LEXIS 13106, at *16-17 (D. Mass. July 10, 2025) (Saylor, J.) (undue hardship established where hospital made a reasonable decision based on available scientific evidence that vaccines reduced risk of infection and disease)

*Lavine v. Mass General Brigham Inc.*, No. 23-10987-BEM, 2025 U.S. Dist. LEXIS 89722, at *18-19 (D. Mass. May 12, 2025) (Murphy, J.) (undue hardship established where hospital relied on then-available objective, scientific information to determine that vaccinated employees were less likely to transmit COVID-19 than unvaccinated employees)

*Hebert v. Dep't of Developmental Servs.,* No. 23-11037, 2025 U.S. Dist. LEXIS 18659, at *20-22 (D. Mass. February 3, 2025) (Joun, J.) (undue hardship established where employer relied on findings of public health authorities that vaccines were highly effective at reducing transmission, citing findings of First Circuit in *Doe v. Mills,* 16 F.4th 20 (1st Cir. 2021*), cert. denied*, 142 S. Ct. 17 (2022)

*Cyr v. Boston Medical Ctr.,* No. 1:22-cv-11930, 2025 U.S. Dist. LEXIS 11168, at *16-18 (Kobick, J.) (D. Mass. January 22, 2025) (undue hardship established based on increased risk of plaintiff's contracting COVID-19 and transmitting it to patients and staff and increased staffing shortage, which would harm employer's ability to provide critical medical care)

*Quintal v. Dep't of Developmental Servs.,* 761 F. Supp. 3d 350, 355-56 (D. Mass. January 1, 2025) (Saris, J.) (undue hardship established based upon expert testimony that vaccination is the most effective method for preventing the spread of COVID-19, and based upon increased risk to residents, staff, and members of the public from unvaccinated worker), *appeal docketed*, No. 25-1069 (1st Cir. 2025)

*Andrade v. Mass. Dept. of Corr.,* No. 22-11899-FDS, 2025 U.S. Dist. LEXIS 18754, at *17 (D. Mass. January 13 2025) (Saylor, J.) (undue hardship established based upon publicly-available data establishing that vaccine was effective in reducing infection and transmission rates), *appeal docketed*, No. 25-1094 (1st Cir. 2025)

*Anastos v. Bos. Med. Ctr,* No. 22-11971, 2025 U.S. Dist. LEXIS 14919, at *13-14 (D. Mass. Jan. 7, 2025) (Joun, J.) (undue hardship established where employer relied on the CDC recommendation that vaccination was the best way to prevent infection and transmission of the virus; questions about the efficacy of the vaccine did not create a dispute of material fact), *appeal docketed*, No. 25-1076 (1st Cir. 2025)

*Buchanan v. Mass. Dep't of Corr.,* No. 23-10192-FDS, 2024 U.S. Dist. LEXIS 231679, at *13-17 (D. Mass. December 23, 2024) (Saylor, J.) (undue hardship established where data publicly available at the time established vaccine was effective in reducing infection and transmission of the virus, holding that questions relating to "breakthrough infections" did not raise an issue of disputed fact)

*Harmon v. Bos. Med. Ctr*., No. 1:22-cv-11856-MJJ, 2024 U.S. Dist. LEXIS 208799, at *13-14 (D. Mass. November 18, 2024) (Joun, J.) (undue hardship established based on hospital's reliance on CDC recommendation that vaccination was the best way to prevent infection and transmission of the virus and hospital's own experience, rejecting arguments that vaccine was ineffective, was experimental and that natural immunity was as protective created material issues of fact), *appeal docketed*, No. 24-2073 (1st Cir. 2024)

*Howe v. Mass. Dep't. of Corr.*, No. 4:22-cv-40119-MRG, 2024 U.S. Dist. LEXIS 131529, at *11-15 & n.2 & n.5 (D. Mass., July 25, 2024) (Guzman, J.) (undue hardship established, with court taking judicial notice of CDC guidance that "although masking and frequent testing are feasible measures and have proven effective in reducing the spread of COVID-19, they are not as protective as vaccination," and holding that the litigation was not the proper forum to "litigate the science around the COVID-19 vaccine, which the nation's leading public health experts concluded is the best way to prevent the spread of the virus and the severity of the disease")

*Haley v. Executive Office of Health and Human Services,* No. 23-11691-RGS, 2024 U.S. Dist. LEXIS 76414, at *3-4 (D. Mass. April 26, 2024) (Stearns, J.) (undue hardship established where plaintiff's job required in person meetings and working unvaccinated risked health and safety of coworkers, some of whom provided direct care to vulnerable population), *appeal docketed*, No. 24-145 (1st Cir. 2024)

*Antredu v. Mass. Dep't of Youth Servs.,* 729 F. Supp. 3d 76, 84 (D. Mass. 2024) (Young, J.) (undue hardship established where record demonstrated job duties included in-person, one-on-one interaction with youth, families and other persons, including close contact and physical restraint)

*Isaac v. Exec. Off. of HHS,* No. 22-11745, 2023 U.S. Dist. LEXIS 219788, at *3-5 (D. Mass. December 11, 2023) (Sterns, J) (undue hardship established under clarified *Groff* standard, finding plaintiff's essential job functions required her to conduct in-person meetings and her proposed hybrid schedule risked the health and safety of individuals some of whom were particularly vulnerable to COVID-19 due to age or living situation), *appeal dismissed*, No. 23-2065, 2024 U.S. App. LEXIS 15527 (1st Cir. February 22, 2024)